UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

K.C., individually and as guardian of minor child, K.R.C.,

Plaintiff,

v.

PENINSULA SCHOOL DISTRICT, et. al.,

Defendants.

CASE NO. No. 3:24-cv-05908-BHS

ORDER

THIS MATTER is before the Court on defendant Cameron Miller's motion for summary judgment, Dkt. 29, and defendants Peninsula School District and football coach Ross Filkins' motion for summary judgment, Dkt. 33.

This case arises from injuries plaintiff K.R.C. sustained during a 2023 high school rivalry football game between Peninsula High School and Gig Harbor High School, widely known as the "Fish Bowl." K.R.C was the quarterback for Gig Harbor High School. After throwing an interception, he ran toward his own endzone to prevent a touchdown. The intercepting player was tackled at about the 45-yard line. Two or three

seconds later, about 20 yards downfield, Peninsula linebacker Miller "tackled"[1] quarterback K.R.C. face to face, breaking his jaw, damaging a tooth, and causing a concussion and temporary weakness in his legs. K.R.C. contends, and Miller does not deny, that Miller called him a "pussy" just before he hit him.

K.R.C. and his mother[2] sued, asserting an assault and battery claim against Miller; a 42 U.S.C. § 1983 claim for violating his substantive due process right to "personal security and bodily integrity" against Filkins; a *Monell* claim and a vicarious liability claim against the District; and negligence, gross negligence, loss of consortium, negligent infliction of emotional distress, and RCW 4.24.010 injury to a child claims against all defendants. Dkt. 1.

Defendants move for summary judgment on each claim. Miller argues that K.R.C. voluntarily assumed the risk of injury by playing football, which "by 'necessity . . . involves forceful bodily contacts." Dkt. 29 at 8. Miller asserts that there is no evidence that he "targeted [K.R.C.] with malicious intent, used a prohibited technique, or engaged in conduct that would be considered extraordinary or aberrational within the sport." *Id.* at 9.

---

[1] The parties refer to Miller's contact with K.R.C. as a block, tackle, block tackle, pancake block, and assault. Miller himself calls the play a "tackle." Miller Dep., Dkt. 39 at 189. Under the NFHS rules, the play was a block (even if may have been improper) because when Miller's teammate intercepted K.R.C.'s pass, K.R.C. became a defensive player and Miller became an offensive player. Miller was an offensive player, blocking for his teammate who had the ball. The Court will generally refer to Miller's contact as a late hit.

[2] The Court refers to both plaintiffs as K.R.C. unless the context requires more specific identification.

Filkins argues there is no evidence he "created any particularized danger directed specifically at K.R.C" or that he "acted with deliberate indifference to a known or obvious danger." Dkt. 33 at 2. Filkins contends that even if he did violate K.R.C.'s due process right he is entitled to qualified immunity because K.R.C. has failed to demonstrate that any violation was clearly established. *Id.* at 18.

The District contends there is no evidence that it "had a custom of deliberate inaction toward known quarterback-targeting and sportsmanship risks." Dkt. 43 at 7. Instead, the District asserts the evidence is undisputed it took affirmative steps prior to the Fish Bowl to address sportsmanship concerns. It asserts that "[t]he fact that those steps ultimately did not prevent K.R.C.'s injury does not transform them into deliberate indifference." *Id*.

K.R.C. argues that the circumstances surrounding the incident "are genuinely disputed." Dkt. 38 at 3. Specifically, he contends that viewed in the light most favorable to him, the evidence—the timing, distance, disengagement of the first blocker, K.R.C.'s retreat, the name calling, the head to head contact, and the resulting personal-foul—could permit a reasonable jury to find that Miller's late hit "created a qualitatively different risk" than that inherent in football. *Id.* at 13.

K.R.C. contends that Filkins and the District had notice of the increased risk to quarterbacks in this particular game but failed to take preventative action. Dkt. 41 at 10. He asserts that Filkins created a culture of unsportsmanlike conduct and encouraged players to engage with the quarterback following an interception. *Id.* at 21.

## I. BACKGROUND

After the 2022 Fish Bowl, Gig Harbor's coach raised concerns that Peninsula players had repeatedly targeted Gig Harbor's quarterback. Dkt. 41 at 2. He sent footage of the allegedly offending plays to the Gig Harbor athletic director, who then forwarded the video to District administrators. *Id.* Filkins, Peninsula's head football coach and athletic director, reviewed the game footage and did not find the targeting allegations credible. Filkins Dep., Dkt. 35-1 at 29. He testified that he took the concerns seriously but did not alter his approach. *Id.*

On the first day of the 2023 school year, the District held a sportsmanship summit involving both schools. Murphy Dep., Dkt. 35-2 at 5. Participants included approximately 20 adults and 30 students from each school, including athletes, cheerleaders, ASB leaders, coaches, principals, and parents. *Id.* The summit focused on improving sportsmanship and respect, including encouraging participants to support their own teams without directing negative behavior toward the opposing team. *Id.* On September 14, 2023, the day before the Fish Bowl, a Gig Harbor parent met with the District superintendent, assistant superintendent and a school board member to report concerns about the alleged targeting of Gig Harbor football players by Peninsula players. Dkt. 41 at 9.

On September 15, 2023, the District hosted the Fish Bowl at Peninsula High School's Roy Anderson Field.[3] Dkt. 33 at 3. K.R.C., a 16 year old sophomore, made his

---

[3] Although Peninsula was designated the home team for the 2023 Fish Bowl, both schools play their home games at Roy Anderson Field.

first varsity start as Gig Harbor's quarterback. Dkt. 38 at 3. During the first half, Gig Harbor coach Darrin Reeves observed what he considered to be "questionable" late hits against K.R.C. that were not penalized. Reeves Dep., Dkt. 39 at 86. He notified the officials about his concerns. *Id.* K.R.C. also warned the head referee that "if you keep letting them hit us like this, someone is going to get hurt." *Id.* at 28. After one sideline hit, K.R.C. testified that he heard a Peninsula coach say, "you got to get that kid out of the game. He can't keep taking hits like that." K.R.C. Dep., Dkt. 39 at 27.

K.R.C.'s injury occurred after a Peninsula safety intercepted a pass and returned the ball to approximately Gig Harbor's 43-yard line, where he was tackled and the play apparently blown dead.[4] There are two videos (though no audio) of the play, which the Court has reviewed repeatedly. At the time the safety was tackled, K.R.C. was near his own 25-yard line, positioned as the "last line of defense . . . to try and stop him." *Id.* at 31.

Two peninsula players were near K.R.C., "Number 5" and, directly behind him, Miller. Number 5 was blocking K.R.C. He shoved K.R.C. away and appears to back off, perhaps because he believed the play was over. Miller did not stop. K.R.C. testified that Miller then called him a "pussy" or "bitch" before hitting him in the chin with the top of his helmet, and knocking him to the ground. *Id.* at 28. He testified that he remembers Miller grabbing him by the face mask but cannot remember anything else about the

[4] It is not clear from the video, which contains no audio, when the play was actually blown dead. The returner was down, but the video appears to show, and the Defendants' expert opines, that the ball was loose at the end of the play, followed by a brief scramble among the players for possession of the ball. *See* Winnek Report, Dkt. 30-5 at 11.

incident. *Id.* A single sideline observer testified that Miller grabbed K.R.C. by the center of his jersey, threw him to the ground, and "karate chopped" or "tomahawked" him in the face and neck. Boosz Dep., Dkt. 39 at 257. No other witness reported such conduct, including the referee, Kyle Prosser.

The video shows Prosser standing right next to, and watching, the play and the contact. Prosser assessed Miller a 15-yard personal foul penalty for a late hit. Dkt. 41 at 14. Prosser testified that the contact would not have been a foul had it occurred during the continuing action of the play, rather than "a couple of seconds late." Prosser Dep., Dkt. 39 at 142. The video of the incident unfortunately ends abruptly after K.R.C. hits the ground.

Miller testified that his contact with K.R.C. was "not an ideal tackle." Miller Dep., Dkt. 39 at 189. He testified that "[K.R.C.'s] chin hit my head – the top of my head first, or maybe it was my hands," *id*. at 206, and that it was more like "a face mask," *id.* at 192. He explained that he "tackled [K.R.C.] the same way I would tackle anyone else in that situation. . . just the exact same way I've been taught." *Id.* at 192. Miller did not deny calling K.R.C. a "pussy" before the hit. *Id.* at 193.

Peninsula trainer Megan Smart was the first person to evaluate K.R.C. on the field. Dkt. 33 at 5. She testified that K.R.C.'s helmet was off when she arrived and that he had blood coming out of his mouth and looked "disoriented." Smart Dep., Dkt. 35-7 at 6–7. K.R.C. told Smart that his neck, head, and lower back were all hurting. *Id.* at 7. He also told her that he had tingling throughout his extremities and weakness of grip strength. *Id.*

at 8. Smart maintained "C-spine" support for about 25 to 30 minutes until emergency medical services (EMS) arrived. *Id.* at 11.

EMS was delayed in addressing K.R.C.'s injury because the aid car and personnel hired by the District were attending to another student, and a second aid car had difficulty accessing the field. Dkt. 33 at 5. Smart estimated it was "35 to 40 minutes before [K.R.C.] was actually wheeled out of the stadium." Smart Dep., Dkt. 35-7 at 11.

K.R.C. was transported to the hospital where he received treatment for his injuries. Fore Report, Dkt. 30-8 at 2. K.R.C. contends that the "contact caused immediate neurologic, maxillofacial, and dental injuries" and that after the contact, "he could not move his arms, legs, or body; his eyes were swollen and his vision was blurred; and he experienced the worst pain of his life." Dkt. 38 at 9.

K.R.C.'s mother watched the game from stands. K.C. Dep., Dkt. 39 at 510. As soon as she saw that K.R.C. was injured, she made her way down to the field and watched as he received treatment on the field. She described his injuries as her "worst nightmare." *Id.* at 512. She accompanied K.R.C. to the hospital and remained with him that night. Dkt. 38 at 11.

Reeves testified that game officials told him at halftime that "[Filkins] agreed not to play [Miller] anymore in this game." Reeves Dep., Dkt. 39 at 92. Reeves explained that although he felt that Miller's hit warranted ejection due to the "distance away from the play, the time after the play, [and] the leading with the crown of the helmet with excessive force of leaving feet to somebody's head and neck area," the decision to simply keep Miller out of the game would permit him to "learn from it and not miss another

game." *Id.* Reeves further testified that Filkins told him, "Hey, sorry about this. The kid [Miller] has special needs. He can't always control himself." *Id.* at 90. Filkins later denied that he made a comment about Miller having special needs, and instead testified he was referring to "someone else." He did not identify to whom he was referring instead. Filkins Dep., Dkt. 40 at 98.

Filkins testified that he told game officials that Miller was "not going in the game right now." Filkins Dep., Dkt. 35-1 at 15. Filkins explained that he removed Miller "[b]ecause his name was being chanted along with the f-word by many of the Gig Harbor spectators. He was completely emotionally distraught and confused, and he was not [] prepared to go back into a varsity game." *Id.* at 16. Filkins also testified, however, that he never told officials that he would "bench" Miller for the rest of the game. *Id.* at 15.

In any event, Miller did return to the game in the fourth quarter, after Gig Harbor had cut into Peninsula's 14–0 lead. Gig Harbor ultimately won the game 21–20. Reeves Dep., Dkt. 40 at 26.

The next day, Filkins posted this photograph and caption on social media:




Dkt. 1 at 7.

The District conducted an internal investigation of the incident. It sent Filkins a "letter of direction" with the investigator's findings, concluding it was more likely than not that (1) Filkins posted inappropriate and unsportsmanlike material on social media after the game, (2) inappropriately was filmed eating out of the Fish Bowl trophy, (3) improperly allowed Miller to return after initially committing to benching him, and (4) shared personal information about Miller as a way to try and excuse his conduct during the game. Filkins Dep., Dkt. 40 at 130–132; Murphy Dep., Dkt. 40 at 246–47. Filkins was not further disciplined.

In October 2024, K.R.C. sued Miller, Filkins, and the District, seeking general, statutory, and punitive damages, and an order enjoining the District from continuing to engage in unconstitutional conduct. Dkt. 1. He asserts assault and battery claims against

Miller; a 42 U.S.C. § 1983 claim against Filkins; a *Monell* claim and a vicarious liability claim against the District; and negligence, gross negligence, loss of consortium, negligent infliction of emotional distress, and RCW 4.24.010 injury to a child claims against all defendants. Dkt. 1.

Defendants move for summary judgment, arguing that they should not be held liable for K.R.C.'s injuries because K.R.C. assumed the risk of playing football and that there is no evidence that Filkins created any particularized danger directed specifically at K.R.C.

K.R.C. contends that there are questions of fact as to whether Miller's late hit exceeded the known risks of football, whether Coach Filkins encouraged targeting of Gig Harbor's quarterbacks, and whether the District failed to adequately supervise and monitor Filkins' conduct.

The issues are discussed in turn.

## II. DISCUSSION

### A. Summary judgment standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where

there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of showing that there is no evidence that supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. at 248. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990).

**B. K.R.C. assumed the risk of Miller's late hit.**

The Court begins by addressing K.R.C.'s negligence claim, which presents the threshold question whether K.R.C. assumed the risk of Miller's late hit. That inquiry, in turn, informs the Court's analysis of K.R.C.'s intentional tort claims, including the scope of his consent to the hit that caused his injury.

K.R.C. argues that Miller breached his duty to "refrain from creating or unduly enhancing danger through contact after the play has ended and the opponent is no longer part of the action." Dkt. 38 at 14. He contends that Miller acted recklessly when he hit K.R.C., "a retreating defenseless player," in the head after the play had ended. *Id.* at 15.

Miller argues that he cannot be held liable for conduct that "football players knowingly and voluntarily assume when they take the field." Dkt. 29 at 1–2. He contends

that as a coparticipant in a sport, he has only "a restricted duty to not intentionally injure [other participants] or engage in reckless misconduct." Dkt. 42 at 2 (quoting *Pellham v. Let's Go Tubing, Inc*., 199 Wn. App. 399, 409 (2017)). He contends that his hit on K.R.C. did not meet that standard: the "conduct occurred during play," "was football-related," and "resulted from risks inherent in the sport." Dkt. 29 at 9. Miller relies on his own expert's opinion, Victor Winnek, that "the contact occurred during the 'immediate and continuing action,'" and "was 'not away from the action' or 'obviously out of the play.'" *Id.* (citing Winnek Report., Dkt. 30-5 at 6). He points to Winnek's conclusion that the contact was "routine, ordinary and common to the game of football." *Id.* at 10 (citing Winnek Report, Dkt. 30-5 at 19).

K.R.C. responds that Miller violated his "duty to refrain from creating or unduly enhancing danger" by intentionally hitting K.R.C. in the head after the play was over. Dkt. 38 at 14. He correctly asserts that the "general knowledge that football involves forceful contact does not establish consent to every contact[.]" *Id.* at 13. He asserts that Miller's late hit, "after the whistle, [and] roughly 20 yards from the ball carrier," is a risk that "is *not* inherent and necessary as a matter of law." *Id.* (emphasis added). He relies on his own expert Fore's opinion that "Miller attacked his upper body and head in a manner that was unnecessary and far beyond the sport's inherent risk." *Id.* at 9 (citing Fore Dep., Dkt. 39 at 372).

To establish negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause between the breach and the injury. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28 (1994).

Summary judgment is proper if a plaintiff cannot meet any one of these elements. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 553 (2008). The duty of care question implicates three main issues—"the existence of a duty, the measure of that duty, and the scope of that duty." *Centurion Props. III, LLC v. Chi. Title Ins. Co.*, 186 Wn.2d 58, 65 (2016). In determining whether a duty is owed to the plaintiff, "a court must not only decide who owes the duty, but also to whom the duty is owed, and what is the nature of the duty owed." *Id.* (quoting *Keller v. City of Spokane*, 146 Wn.2d 237, 243 (2002)). The question of duty is generally a question of law for the court. *Id.*

In the context of sports, the existence and scope of a participant's duty "depends on the nature of the sport or activity . . . and on the parties' general relationship to the activity." *Knight v. Jewett*, 3 Cal. 4th 296, 313 (1992). A participant owes no duty "to protect a [coparticipant] from dangers that are an inherent and normal part of a sport." *Scott By & Through Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 498 (1992). This no-duty rule can also be explained under the doctrine of implied primary assumption of risk.

Implied primary assumption of risk arises when a plaintiff impliedly consents, often in advance of any negligence by the defendant, to relieve the defendant of their duty to the plaintiff regarding specific known and appreciated risks. *Scott By & Through Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 497 (1992). Consent is inferred from plaintiff's voluntary choice to engage in an activity involving those known risks. *Gleason v. Cohen*, 192 Wn. App. 788, 796 (2016); *see also Pellham*, 199 Wn. App. at 410 (Implied primary assumption of risk "follows from the plaintiff engaging in risky

conduct, from which the law implies consent.”). An inherent risk may include the “careless conduct” of other participants. *Knight*, 3 Cal.4th. at 316.

However, a participant *does* have a duty “not to increase the risks to a participant over and above those inherent in the sport.” *Id.* at 315–316. That duty is breached when a participant “intentionally injures another player or engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport.” *Id.* at 318; *see also Gauvin v. Clark*, 404 Mass. 450, 450, 537 N.E.2d 94 (1989) (“[P]articipants in an athletic event owe a duty to other participants to refrain from reckless misconduct and liability may result from injuries caused a player by reason of the breach of that duty.”). Ordinary negligence arising from conduct within the range of normal play is insufficient to impose liability. *Scott*, 119 Wn.2d at 498.

K.R.C. relies on *Scott*, *Kirk*, and *Gleason* to argue that Miller cannot invoke assumption of risk because he increased the risk of football by hitting him late, when he was “obviously out of play.” Dkt. 38 at 13; *see id.* at 2, 12–13. In *Scott*, the Court concluded that a 12-year-old skier injured after leaving a race course did not assume the risk created by the resort’s allegedly negligent placement of the course near an unfenced, unpadded abandoned shed. 119 Wn.2d at 499–503. In *Kirk*, the Court concluded that a cheerleader did not assume the risk created by the university’s failure to supervise practice or provide a safe practice space. 109 Wn.2d at 451. In *Gleason*, the Court concluded that although a tree cutter assumed the risks inherent in cutting down trees, a question of fact remained as to whether the landowner increased the risk of injury by

requiring him to cut down a tree in an unsafe location and under unsafe conditions. 192 Wn. App. at 800–01.

*Scott*, *Kirk*, and *Gleason* are materially distinguishable. Each addresses the duty of a defendant who controls or creates the conditions under which an activity occurs. This case, by contrast, concerns the more limited duty that one participant owes to another.

*Knight* is more helpful. *Knight* explains that a participant enhances the risk inherent to the sport "only when he or she intentionally injures another player or engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport." 3 Cal. 4th at 318. This rule makes sense. Sports safety rules are designed to reduce the risk of injury, so violating a rule may increase that risk. But some rule violations are an expected and ordinary part of competitive play. To conclude otherwise would be to hold that any penalty or foul that increases the risk of injury could result in tort liability. In the coparticipant context, the conduct must go further—it must be intentional or so reckless that it falls outside the range of ordinary play.

Miller and K.R.C. were participants in a high school tackle football game. Miller did not owe K.R.C. a duty to avoid the ordinary risks of the sport, including careless conduct during play. Rather, Miller owed K.R.C. a duty not to intentionally injure him or to act so recklessly as to fall outside the range of ordinary activities involved in football.

Even viewing the evidence in the light most favorable to K.R.C., no reasonable factfinder could conclude that Miller breached that duty in his contact with K.R.C. K.R.C.'s expert, Fore, opines that "Miller increased the risks inherent to the game of football . . . by hitting him late." Fore Report, Dkt. 30-8 at 19. He also opines that

Miller's hit was "out of the play" and characterizes the play as "egregious." Fore Dep., Dkt. 39 at 372, 356.

But Fore's conclusory opinion is not supported by any defining standard or analysis applying it to the facts. The hit did not occur out of bounds or behind the runner, nor did it occur well after the play had obviously ended. Miller was directly behind the lead blocker, hitting K.R.C. "a couple of seconds" after the play was over. From Miller's perspective, K.R.C. was the last Gig Harbor player that could prevent a touchdown. K.R.C. confirms this himself when he testified that "I was making sure that if the kid had broke through everybody else, that I would have been the last line of defense there to try and stop him." K.C. Dep., Dkt. 39 at 31. While a safety rule violation—such as a late hit—may increase the risk of injury, Fore fails to explain why this late hit, which he concedes did not warrant Miller's ejection, is conduct outside the ordinary risks of football. *See Knight*, 3 Cal.4th at 318–319 (recognizing that liability for rule violations could deter vigorous play and fundamentally alter the sport); Fore Dep., Dkt. 39 at 365.

Fore's report includes "seven expert opinions." Fore Report, Dkt. 30-8 at 3. Only one of these relates to Miller's hit:

> The plaintiff's injury surpassed the inherent risks of football, as the district acknowledged the tackle's atypical nature in a letter to the plaintiff's parents. The quarterback, repeatedly hit late, warned the referee of potential harm, indicating foreseeable risk. The defendant's late hit escalated dangers beyond normal play. Peninsula High School's history of unsportsmanlike penalties in previous Fish Bowl games, and GHHS coaches' recognition of targeted quarterback hits over years suggest a pattern of unchecked aggression. Assistant Coach Jason Gelderman's description of the play as the 'single worst' in 35 years underscores its severity, highlighting a failure to mitigate excessive risks.

Dkt. 30-8 at 20.

Noticeably absent from Fore's analysis is any objective criteria for determining whether the hit itself fell outside the inherent risk of football. Fore does not analyze the specific timing of the hit, the technique used, the players' positions, the flow of the play, or any other feature of the hit against an identified football standard. Quoting the reactions or characterizations of the District, coaches, or other players cannot substitute for an objective explanation of why the hit exceeded the risks of football. Without this, Fore's unsupported conclusions fail to create a genuine issue of material fact.

By contrast, Winnek applied the 2023 NFHS rules and opined that the contact was not a flagrant foul warranting disqualification. Winnek Report, Dkt. 30-5 at 22. He explained that the contact was not: "a blindside block, targeting, illegal contact against a defenseless player, charging into a player away from the play, piling on, unnecessary or excessive roughness or throwing a player to the ground in a way prescribed in rule NFHS Rule 9-4-3-b." *Id.* at 6. He concluded that Miller's contact was a "block[5] on a change of possession play that is ordinary and anticipated." *Id.* at 22. Winnek explained:

> [K.R.C.] was 'obviously not out of the play' as prescribed by rule and officiating standards. [K.R.C.] was a downfield defender who had put himself in position as the last defender of the goal line for his team. The contact was during the immediate and continuing action of the tackled ballcarrier, and the ball was not 'clearly dead' at the instant of the down field block. I did not observe defendant [Miller] or his Peninsula High School teammates at any time during the play exhibit contact or actions that rise to a level warranting disqualification/ejection from the game.

---

[5] NFHS Rule 2-3-1 defines blocking as "obstructing an opponent by contacting him with any part of the blocker's body."

*Id.* at 27. Winnek further opined that he "did not observe evidence of routine or choreographed techniques . . . wherein [Miller] executed physical contact, in a way that increased danger of injury or appeared to be punitive against a quarterback." *Id.* at 21. Winnek concluded that "[t]his play is common to the game of football." *Id.* at 22.

Referee Prosser, who was closest to the play, reached the same conclusion. He testified that "[K.R.C.] was the last line of defense," was "engaging in the play," and was "not simply a bystander watching the play." Prosser Dep., Dkt. 39 at 142, 150. He explained that K.R.C. was not defenseless and "if it would have been continuing action together, I would have had no foul, but because it happened a couple of seconds after the play was ended . . . I had a personal foul for a late hit." Dkt. 39 at 142. He also confirmed that Miller's action did not support an ejection.

Significantly, Fore agrees that Miller's conduct did not warrant automatic ejection. Fore Dep., Dkt. 39 at 365. That matters. If the contact was not serious enough to require ejection under the rules of the game, it is difficult to characterize it as so reckless that it fell outside the range of ordinary football activity. At most, the evidence shows a late hit warranting a penalty—not conduct giving rise to tort liability.

Fore relies primarily on witness' descriptions of the play as "100 percent targeting"[6] and "the dirtiest play he had seen at any level of the sport," as well as the

[6] The characterization of the conduct as "targeting" came from Gig Harbor's volunteer equipment manager. Prosser did not call a targeting violation on the play. Likewise, neither parties' expert referred to the contact as targeting. In the light most favorable to K.R.C., it could have been targeting. But even that is not enough to establish that the contact fell outside the inherent risks of football.

District's letter that the "injuries [K.R.C.] sustained are inconsistent with a typical football tackle" to support his conclusions. Fore Report, Dkt. 30-8 at 20. But those characterizations do not establish the relevant standard. Fore offers no objective basis for concluding that Miller's conduct fell outside the ordinary risks of tackle football, an inherently violent, collision sport.

On review of this record, none of K.R.C.'s evidence creates a *genuine* issue of fact. Superlatives are not enough to create tort liability. There must be something more—some feature of the contact that takes it beyond a personal foul warranting a 15-yard penalty and places it outside the known risks inherent in the sport.

There is no such evidence. K.R.C.'s own expert acknowledges that Miller's conduct did not rise to the level of conduct warranting ejection. And a single observer's description of the contact as a "karate chop" or "tomahawk" does not create a *genuine* factual dispute in the absence of corroborating witnesses and in the face of overwhelming evidence that this was nothing more than a late hit. Because the record supplies no basis from which a reasonable factfinder could conclude that Miller's conduct crossed the line from a football violation into conduct beyond the risks inherent in the sport, K.R.C. cannot establish that Miller breached his duty. Because there is no breach, there is no negligence.

Miller's motion for summary judgment on K.R.C.'s negligence claim, including his motion for summary judgment on his affirmative defense of assumption of risk, is **GRANTED.**

Nor does the evidence support K.R.C.'s claim that Miller's actions were grossly negligent. "Gross negligence" constitutes the failure to exercise slight care and is "substantially and appreciably greater than ordinary negligence." *Harper v. State*, 192 Wn. 2d 328, 342 (2018) (quoting *Nist v. Tudor*, 67 Wn.2d 322, 331 (1965)). The failure to exercise slight care does not mean "the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence." *Id.* This standard addresses the *degree* of the defendant's breach; it does not expand the *scope* of the duty owed. Miller, a coparticipant in tackle football, had no duty to protect K.R.C. from risks inherent in the sport. Liability arises only if Miller intentionally injured K.R.C. or engaged in conduct so reckless that it fell outside the range of ordinary football activity. K.R.C. cannot avoid the coparticipant duty standard merely by characterizing Miller's actions as grossly negligent. Because K.R.C. fails to provide evidence that Miller's actions fell below the duty of care (intentional and reckless), let alone substantially, his gross negligence claim must also fail.

Miller's motion for summary judgment on K.R.C.'s gross negligence claim is **GRANTED**.

**C. K.R.C. consented to Miller's late hit, a risk inherent in football.**

K.R.C.'s primary claim against Miller is for the intentional tort of battery.[7] He contends that Miller "unnecessarily attacked [his] upper body and head, tackled him after the play, and exceeded football's inherent risks." Dkt. 1 at 14.

Miller contends that he cannot be held liable because there is no dispute that K.R.C. consented to "the range of vigorous, competitive contact (including rule infractions occurring in the flow of play) that co-participants necessarily accept by taking the field." Dkt. 42 at 6. He asserts that football players "consent to collisions, blocks, tackles, and forceful contact that remain dangerous." Dkt. 29 at 8.

A battery is "an intentional and unpermitted contact with the plaintiff's person." *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 504 (2014). A person is liable for battery if he or she intends to cause a harmful or offensive contact and such a contact directly or indirectly results." *Id.* (citing Restatement (Second) of Torts § 13 (1965)). The intent element is satisfied if a defendant knows to a substantial certainty that his or her actions will result in the contact. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 865 (2014).

One who effectively consents to the contact of another cannot recover under tort for the conduct or harm resulting from it. *Hunt v. Zuffa, LLC*, 694 F. Supp. 3d 1319, 1334

[7] K.R.C.'s assault claim asserts that Miller's contact "was harmful, offensive, and/or created apprehension . . . of such conduct, which was not anticipated . . . and which [K.R.C.] did not consent." Dkt. 1 at 14. Because the Court concludes that K.R.C. impliedly consented to the contact as an inherent risk of football, his assault claim fails for the same reason as his battery claim.

(D. Nev. 2023), *aff'd*, No. 23-3113, 2025 WL 1164219 (9th Cir. Apr. 22, 2025) (concluding there was no battery where MMA fighter consented "to the same or substantially the same contact, degree of force, and consequences"). In other words, there is no battery where the plaintiff consents. *Id; see Kumar*, 180 Wn.2d at 505.

K.R.C. consented to Miller's late hit, generally and specifically by setting himself up as the last defender to prevent a touchdown. *See* K.R.C. Dep., Dkt. 39 at 31 ("I was making sure that if the kid had broke through everybody else, that I would have been the last line of defense there to try and stop him."). No reasonable factfinder could conclude that Miller's late hit exceeded the scope of that consent.

Miller's motion for summary judgment on K.R.C.'s battery claim is **GRANTED**.

K.R.C.'s outrage claim also fails. Outrage requires (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) resulting severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003). The evidence does not support a finding that Miller acted intentionally or recklessly. Miller's summary judgment motion on K.R.C.'s outrage claim is **GRANTED**.

**D. There is no evidence that Filkins affirmatively created or increased the risk of danger to K.R.C.**

K.R.C. claims that Filkins violated his due process right to "health, personal security, and bodily integrity" by encouraging his players to target quarterbacks following interceptions. Dkt. 1 at 9; Dkt. 41 at 21. He contends that "Filkins had an active role in designing and leading the football program, including by teaching and managing the players under his supervision." *Id.* at 20. He asserts that the K.R.C.'s injury suggests

an "inference" that Peninsula players implemented his coaching directive to pursue the quarterback despite the distance from the play. *Id.*

The District argues that there is no evidence that Filkins encouraged dangerous conduct or unsportsmanlike or dirty plays. Dkt. 33 at 14–15. The District asserts that, to the contrary, Filkins "instructed his players to play a clean game," "took steps to encourage safe and sportsmanlike play," and "used coaching techniques that he felt would be safe for students." *Id.* at 14, 15. The District asserts that instructing players to move upfield after an interception and treating the opposing quarterback as a defensive player is "standard football instruction, not affirmative conduct creating danger." Dkt. 43 at 3.

K.R.C. responds that Filkins created a danger that "K.R.C. would not have otherwise faced." Dkt. 41 at 21. He asserts that under Filkins' leadership, Peninsula has a history and culture of "late hits against . . . opposing quarterback[s]," and that players followed his directives to "engage with the quarterback following an interception." *Id.* K.R.C. cites testimony of a District employee who investigated the incident and stated "that [Filkins] conduct likely did correlate to what had occurred on the field." Murphy Dep., Dkt. 40 at 256. He also points to Fore's testimony, who opined that football players under Filkins "understood a late pursuit and tackle of an opposing quarterback to be acceptable." Fore Dep., Dkt. 40 at 17.

To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right. *Tatum v. City*

*& Cnty. of S.F.*, 441 F.3d 1090, 1094 (9th Cir. 2006). The Due Process Clauses in the Fifth and Fourteenth Amendments "generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (holding that Department of Social Services had no constitutional duty to protect a child from his father after receiving reports of potential abuse). As a corollary, the Fourteenth Amendment typically "does not impose a duty on [the state] to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007). The "'general rule is that a state is not liable for its omissions.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) (citation modified)).

An exception to the rule applies where state action "affirmatively places the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citation modified) (citing *DeShaney*, 489 U.S. at 197). For the "state-created danger" exception to apply, a plaintiff must show that a (1) state official's "affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced," (2) the injury was foreseeable, and (3) the official acted with deliberate indifference to the known danger. *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019); *see also Patel*, 648 F.3d at 974.

There is no evidence that Filkins affirmatively acted to create an actual and particularized danger to opposing quarterbacks. K.R.C. argues that Filkins "affirmatively taught his players that following an interception, his players were to play offensively and move up field to block, while treating the quarterback as a defender." Dkt. 41 at 20. But as Winnek explains, this is "routine reasonable conduct of football players during a change of possession." Dkt. 30-5 at 22. Winnek opines that there was "nothing excessively rough" as to Miller's block on K.R.C. and that Miller "execut[ed], proper ordinary, football mechanics on this type of play." *Id.*

Referee Prosser agreed with that assessment, explaining that K.R.C. was "not a defenseless player" and that "there would have been no foul" if the tackle would have happened "a couple of seconds" earlier. Prosser Dep., Dkt. 39 at 142–43. Although K.R.C. refers to Miller's block as an "assault," Dkt. 1 at 1, K.R.C. fails to offer evidence that Coach Filkins taught improper blocking techniques or encouraged conduct that exposed quarterbacks, and specifically K.R.C., to an unforeseeable danger that K.R.C. should not otherwise have expected.

K.R.C. next argues that Filkins encouraged the "recurring pattern of late hits against the opposing quarterback." Dkt. 41 at 21. He argues that the danger was "different from football's baseline collision risk," and that Peninsula focused on directing late hits against Gig Harbor's quarterback. *Id.* at 23. He relies on the Ninth Circuit's decision in *Martinez* to argue that Filkins' directives to his players increased the risk of harm to opposing quarterbacks.

In *Martinez*, a law enforcement officer disclosed the plaintiff's confidential report of domestic violence to her alleged abuser. The Ninth Circuit concluded that a reasonable jury could find that the officer's comments "emboldened [the abuser] to believe that he could further abuse [the plaintiff,] including by retaliating against her for her testimony, with impunity." *Id.* at 1272. In other words, there was evidence that the officer's affirmative conduct increased a specific and known danger to the plaintiff.

*Martinez* is materially different. The record in this case contains no comparable evidence. K.R.C. identifies three late hits in the 2022 Fish Bowl game that he argues supports an "inference" that Filkins directed or condoned such conduct. But mere awareness of those prior late hits, standing alone, does not establish that he "affirmatively" directed his players to engage in similar conduct. There is no evidence connecting the three prior late hits to any policy, custom, or practice attributable to Filkins. Rather, K.R.C.'s own expert acknowledges that there is no evidence that Filkins ever told his players that late hits were acceptable. Fore Dep., Dkt. 39 at 365. Football exposes quarterbacks to the risk of unlawful or rule violating contact by opposing players. Absent evidence that Filkins directed, facilitated, or otherwise increased that risk, the occurrence of prior late hits in the 2022 Fish Bowl does not transform that preexisting danger into one created by the state.

Nor did K.R.C. establish that Filkins acted with deliberate indifference to this known danger. Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). The standard is even higher than gross

negligence: "[t]he state actor must 'recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Patel*, 648 F.3d at 974 (quoting *Grubbs*, 92 F.3d at 899). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Id*.

K.R.C. emphasizes that Filkins was on notice about prior late hits and nevertheless failed to remove Miller from the game after committing the late hit against K.R.C. He argues Filkins actions communicated to the team that "the District prioritized winning over safety." Dkt. 41 at 24. But this factually unsupported opinion falls short of establishing deliberate indifference to a state-created danger.

Significantly, both experts agree that Miller's late hit did not warrant an ejection. Filkins' decision not to formally discipline Miller for the late hit does not establish that he approved the hit or encouraged similar conduct. Nor does his awareness of prior late hits make him responsible for every late hit penalty committed by one of his players against a quarterback. K.R.C. must produce evidence permitting a reasonable inference that Filkins, with knowledge of the danger, nevertheless took some *affirmative action* in deliberate indifference to exposing K.R.C. to a greater danger than he otherwise would have faced. He has not.

Filkins' motion for summary judgment on K.R.C.'s § 1983 claim against him is **GRANTED**.

**E. Filkins is entitled to qualified immunity.**

Filkins argues that he is entitled to qualified immunity because even if he violated K.R.C.'s due process rights, K.R.C. has not met his burden of demonstrating that the right was clearly established. Dkt. 33 at 16. He asserts that "[n]o reasonable coach would understand from existing precedent that instructing players on post-interception assignments or making in-game coaching decisions about player participation could violate an opponent's constitutional rights." Dkt. 43 at 9–10.

K.R.C. responds that the right need not be framed with such specificity; rather, the question is "whether the 'state of the law' at the time of the alleged violation gave the defendant 'fair warning that their alleged' actions were unconstitutional. Dkt. 41 at 26 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). He contends that it is clearly established that "a state official violates substantive due process when he affirmatively uses governmental authority, instruction, or control to increase a specific person's vulnerability to a known danger of private violence and deliberately disregards that danger." Dkt. 41 at 26.

Qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The reasonableness inquiry is objective, evaluating whether an official's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Graham v. Connor*, 490 U.S. 386, 397 (1989)).

Even if an official's decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). As a privilege from suit, not merely from liability, qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citing *Malley v. Briggs*, 475 U.S. 335 (1986)).

For a constitutional right to be clearly established, a Court must define the right at issue with specificity, and not at a high level of generality. *Gordon v. County of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (citing *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)). The Court's goal is to "define the contours of the right allegedly violated in a way that expresses what is really being litigated." *Id.* at 969 (citations omitted). Qualified immunity is not meant to be analyzed in terms of a "general constitutional guarantee," but rather the application of constitutional principles "in a particular context." *Id.* (citations omitted). ). Ultimately, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (citing *District of Columbia v Wesby*, 538 U.S. 48, 63 (2019)).

The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct. *Id.*; *see also Romero v. Kitsap County*, 931 F.2d 624 (9th Cir. 1991). However, because resolving whether the asserted federal right was clearly established presents a pure question of law, the Court draws on its ''full knowledge'' of relevant precedent rather than restricting its review to cases identified by

the plaintiff. *Gordon*, 6 F.4th at 969 (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)).

K.R.C. again relies on *Martinez* to argue that a state official violates a clearly established substantive due process right by "emboldening" another to commit private violence. Dkt. 41 at 26. He also relies on *P.B. v. Koch*, 96 F.3d 1298 (9th Cir. 1996) and *Meeker v. Edumndson*, 415 F.3d 317 (4th Cir. 2005), cases involving school officials who allegedly participated in or encouraged physical abuse of students.

In *P.B.*, the Ninth Circuit held that a student had a clearly established right to bodily integrity against a principal's use of corporal punishment. 96 F.3d at 1303 (concluding that the "Fourteenth Amendment protects against the government's interference with 'an individual's bodily integrity'"). The court explained that "no reasonable principal could think it constitutional to intentionally punch, slap, grab, and slam students into lockers." *Id.* at 1304.

In *Meeker*, the Fourth Circuit affirmed the trial court's denial of summary judgment on qualified immunity where a high school wrestling coach "frequently 'initiated and encouraged' abuse of [a student wrestler] by other members of the wrestling team." 415 F.3d 317. The Court emphasized that the claim was not based on the coach's failure to intervene or protect wrestlers from harm inflicted by others, but on allegations that the coach "instituted, permitted, endorsed, encouraged, [and] facilitated" the beatings." *Id.* at 322. The Court concluded that the coach could not "escape liability simply because he did not administer the beatings with his own hands." *Id.* at 322.

Those cases are inapposite. Unlike *P.B.* and *Meeker*, there is no evidence that Filkins encouraged his players to intentionally injure opponents or engage in reckless conduct. K.R.C.'s own expert testified that he reviewed no evidence or witness testimony confirming that Filkins told his players that late hits were acceptable, opining instead that Filkins believed he was "above the law." Fore Dep., Dkt. 39 at 365. That is not enough. Miller's tackle fell within the ordinary risks of football, and there is no evidence that Filkins instructed his players to disregard the NFHS rules or intentionally harm opposing players. K.R.C. cites no case that clearly establishes that a coach may be held constitutionally liable for harm arising from the inherent risks of the sport.

Filkins' motion for summary judgment on qualified immunity is **GRANTED**.

**F. There is no evidence that the District maintained any policy that disregarded student safety.**

K.R.C. claims that the District violated K.R.C.'s due process right to personal security and bodily integrity by failing to properly train its coaches, failing to adopt and implement policies ensuring the health and safety of its students, and failing to appropriately sanction Filkins for his actions. Dkt. 1 at 9–10.

The District argues that because K.R.C. failed to establish violation of an underlying constitutional right, he necessarily fails to prove his *Monell* claim against the District. Dkt. 33 at 19. It also argues that K.R.C. fails to provide evidence of a direct causal link between the alleged deficient policies and K.R.C.'s injury. *Id.* at 20. It asserts that a single prior game with multiple late hits does not establish a policy or custom of encouraging such penalties Dkt. 43 at 7. It contends that the failure to act on a warning

about targeting quarterbacks does not establish a policy of deliberate indifference to constitutional rights. *Id.* at 8.

K.R.C. contends that the District's "repeated inadequate response to serious concerns and warnings is an institutional custom of declining to prioritize student athlete safety." Dkt. 41 at 29. Specifically, he asserts that despite repeated warnings, "District administrators declined to formulate a plan to prevent targeting, alert GHHS's athletic director, or direct Defendant Filkins to take preventative measures." *Id.* at 29. He further argues that the District's finding that Filkins' committed misconduct, coupled with its failure to impose discipline, demonstrates that the District ratified the alleged custom of prioritizing winning over safety and targeting opposing teams' quarterbacks. *Id.* at 30.

To impose *Monell* liability under § 1983, a plaintiff must allege sufficient factual matter, accepted as true, to establish: (1) they were deprived of a constitutional right; (2) the district had a policy; (3) the policy amounts to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy is the moving force behind the constitutional violation. *Gordon*, 6 F.4th at 973.

K.R.C. has not provided sufficient evidence to satisfy step one. There is no evidence that Filkins coached his players to target quarterbacks after the play had ended. Without evidence of a due process violation, K.R.C.'s *Monell* claim necessarily fails. Moreover, even if there was such evidence in the record, K.R.C. fails to show that Filkins policy was the moving force behind Miller's late hit.

The District's motion for summary judgment on the § 1983 claim against the District is **GRANTED**.

**G. K.R.C.'s remaining state law claims against Filkins and the District necessarily fail as a matter of law.**

K.R.C. claims that Filkins breached his duty to "refrain[] from taking affirmative acts that exposed [K.R.C.] to harm from the foreseeable conduct of [his players]." Dkt. 1 at 11. He further claims that the District breached its duty to hire, train, and supervise its agents, including coaches. *Id.* He asserts that the District is vicariously liable for the actions of Filkins and the entire coaching staff. *Id.* at 13.

The District does not separately address these claims, but K.R.C. makes the same arguments in support of these claims as he does to support his § 1983 and *Monell* claims. These arguments fail for the same reasons. K.R.C. asserts that Filkins breached his duty by encouraging his players to "engage with the quarterback following an interception." Dkt. 41 at 21. But blocking a quarterback after an interception is not, by itself, improper. Winnek correctly explained that, once K.R.C. threw an interception, he "transitioned from [p]asser to defender" and blocking a player "down field in advance of a run . . . is common and ordinary to the game." Winnek Report, Dkt. 30-5 at 21. There is no evidence that Filkins encouraged anything more.

Nor does K.R.C. present evidence that Miller acted pursuant to any District policy of ignoring the rules or intentionally targeting quarterbacks. K.R.C. relies on three late hits in the 2022 Fish Bowl to infer such a policy. But as Fore acknowledged, there is no evidence that Filkins or the other coaches instructed players to ignore rules. Moreover, there is also no evidence that Miller's late hit exceeded the ordinary risks of the game. Without more, K.R.C.'s state law claims necessarily fail as well.

The District's motion for summary judgment on negligence, gross negligence, outrage, and vicarious liability claims is **GRANTED**.

**H. Without evidence to support the underlying claims, K.C.'s derivative state law claims also fail.**

K.R.C.'s mother asserts separate negligent infliction of emotional distress, loss of consortium, and statutory injury to a child claims against Miller and the District, based on her witnessing her son's injury. Each claim relies on a "bystander" theory of recovery.

The bystander doctrine allows family members traumatized by witnessing the scene of injuries caused by negligent conduct directed at a loved one to recover for their emotional distress. *Hegel v. McMahon*, 136 Wn.2d 122, 128 (1998). To survive summary judgment on these claims, K.C. must provide evidence that, viewed in the light most favorable to her, Miller or the District breached a duty. Because there is no evidence to support those underlying claims, K.C.'s derivative claims also fail. Miller and the District's motions for summary judgment as to these claims is **GRANTED**.

## III. ORDER

High school football is a violent collision sport. Players routinely block, tackle, and make serious physical contact with one another, and even when the game is properly coached and played, personal fouls and injuries can and do occur. But a penalty or late hit, without more, does not transform an otherwise inherent risk of football into tortious—much less unconstitutional—conduct by a player, coach, or school district. If it did, the sport of high school tackle football would likely vanish.

Even viewing the evidence in the light most favorable to K.R.C., his claims all fail as a matter of law. There is no evidence that Miller's late hit exceeded the risks inherent to the game of high school tackle football. There is also no evidence that Filkins instructed his players to ignore the rules or play the game in such a way that increases the risk of harm to others.

Miller and the District's motions for summary judgment, Dkts. 29 and 33, are **GRANTED**. K.R.C. and K.C.'s claims are dismissed with prejudice.

The clerk shall close the case.

Dated this 28th day of August, 2026.

BENJAMIN H. SETTLE
United States District Judge